## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

          Plaintiff,                        **Criminal No. 14-130 (SRN/SER)**

v.

Derek Lamon Johnson,               **REPORT AND RECOMMENDATION**

          Defendant.

     Carol M. Kayser and Sarah E. Hudleston, Esqs., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

     Manvir K. Atwal, Esq, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

     The above-captioned case comes before the undersigned on Defendant Derek Lamon Johnson's ("Johnson") Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Mot. to Suppress") [Doc. No. 15]. This matter has been referred for the resolution of the issues raised in Johnson's Motion pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, this Court recommends denying Johnson's Motion to Suppress.[1]

---

[1]     Johnson's Motion for Disclosure of 404 Evidence [Doc. No. 10], Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant [Doc. No. 11], Motion for Discovery and Inspection [Doc. No. 12], Motion for Discovery of Expert under Rule 16(a)(1)(G) [Doc. No. 13], and Motion to Retain Rough Notes and Evidence [Doc. No. 14] were addressed in a separate Order. (Order Dated July 22, 2014) [Doc. No. 32]. Plaintiff the United States of America's (the "Government") Motion for Discovery Pursuant to Federal Rules of Criminal Procedure 16(b), 12.1, 12.2, 12.3, and 26.2 [Doc. No. 27] was addressed in the same Order. (*Id.*).

## I.        BACKGROUND

On May 5, 2014, a grand jury indicted Johnson with one count of being a felon in possession of a firearm (armed career criminal) in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).  (Indictment) [Doc. No. 1 at 1–2].  At a pretrial motions hearing on July 14, 2014, this Court heard testimony from Brooklyn Park Police Department ("BPPD") Sergeant Elliot Faust ("Sergeant Faust") and Bureau of Alcohol, Tobacco, Firearms, and Explosives Agent Nicole Hajny. (Ex. & Witness List) [Doc. No. 26]. The Court received into evidence Government's Exhibit 1, a copy of the squad video from Sergeant Faust's squad car; Government's Exhibits 2 and 3, photographs of a mason jar; and Government's Exhibit 4, a photograph of a handgun. (*Id.*). The Court also received into evidence Johnson's Exhibit 1, a copy of the squad video from BPPD Officer Kor Zoua Xiong's ("Officer Xiong") squad car, and Johnson's Exhibit 2, a photograph of the back seat of the vehicle that was searched on the night of the alleged offense. (*Id.*).

At the request of the parties, the Court ordered supplemental briefing.  (Order Dated July 15, 2014) [Doc. No. 29]. The Court granted both of Johnson's motions for extension of time to file. (Text Only Order Dated August 1, 2014) [Doc. No. 35]; (Order Dated August 7, 2014) [Doc. No. 38]. Johnson submitted his supplemental brief on August 12, 2014, and the Government submitted its response on August 22, 2014.  (Mem. in Supp. of Def.'s Pretrial Mot. to Suppress Evid., "Mem. in Supp.") [Doc. No. 40]; (Gov't's Resp. to Def.'s Mot. to Suppress, "Resp.") [Doc. No. 41]. This case is set for trial before the Honorable Susan Richard Nelson on October 14, 2014. (Trial Notice Dated September 8, 2014) [Doc. No. 42].

2

## II.     FACTS

On February 1, 2014, shortly before 8:00 p.m., Sergeant Faust conducted a traffic stop of a Ford Edge. (Tr. of Mots. Hr'g Held on July 14, 2014, "Tr.") [Doc. No. 31 at 7]. Johnson was the driver. (*Id.*) Sergeant Faust was traveling behind the vehicle and observed that the vehicle's taillights were not working. (*Id.* at 12–13). Johnson pulled the vehicle into a driveway and Sergeant Faust turned on his emergency lights to initiate a stop of the vehicle for the traffic violation he had observed. *See* (*id.* at 13).[2]

Sergeant Faust approached the driver's side of the vehicle with a lighted flashlight in hand and explained to Johnson that his taillights were not working. (Tr. at 13); (Gov't's Ex. 1 at 19:59:37–38, 19:59:42–47). Johnson reported that the vehicle was a rental car. (Tr. at 13). Pursuant to standard procedures, Sergeant Faust asked Johnson for his driver's license and insurance information. (*Id.*). A passenger was in the vehicle, and Sergeant Faust also asked the passenger for identification. (*Id.* at 13–14). Sergeant Faust testified that he "immediately noted the smell of fresh marijuana coming from the vehicle" when Johnson rolled down his window. (*Id.* at 14). After Sergeant Faust engaged in some questioning of Johnson and the passenger, he asked them if they had been smoking marijuana or if anyone had been smoking marijuana in the vehicle because he detected a "slight odor of marijuana" coming from the vehicle. (Gov't's Ex. 1 at 20:01:12–22); (Tr. at 15). Johnson and the passenger told Sergeant Faust that no one had been smoking marijuana. (Gov't's Ex. 1 at 20:01:16–28).

---

[2]     Sergeant Faust's squad camera recorded video of Johnson's vehicle traveling without working taillights and also recorded audio and video from approximately the time Sergeant Faust initiated the stop until around 8:10 p.m., when Sergeant Faust and fellow officers began a search of Johnson's vehicle. (Gov't's Ex. 1 at 19:58:57–19:59:12, 19:59:27–20:09:34).

In addition to the smell of marijuana, Sergeant Faust testified that he observed "green flakes" of marijuana or "shake" on Johnson's shirt.[3] (Tr. at 15, 19). Sergeant Faust also testified that when he approached the vehicle, Johnson was sitting in the driver's seat and that his seat was reclined "unusually far backwards." (*Id.* at 14). In Sergeant Faust's experience, people often recline their seat in order to hide something behind the seat or "to conceal the back portion of the vehicle." (*Id.*).

Sergeant Faust returned to his squad car with Johnson's and the passenger's identification. (*Id.* at 15). Sergeant Faust decided to conduct a narcotics investigation and requested a backup unit. (*Id.* at 15–16.) Sergeant Faust waited for backup to arrive and ran queries on his computer. *See* (Tr. at 17). By approximately 8:05 p.m. Officer Xiong arrived at the scene of the stop. (*Id.*); *see also* (Gov't's Ex. 1 at 20:04:50). Sergeant Faust recounted most of his observations to Officer Xiong, telling her that Johnson was sitting "back deep" in his seat and that Johnson had "green stuff" on his shirt that "look[ed] like weed." (Gov't's Ex. 1 at 20:04:54, 20:05:05–09). Sergeant Faust also informed Officer Xiong that Johnson and the passenger were on federal probation and told her that they were "super nervous." (*Id.* at 20:05:00–05). He reported that he was going to "pull them" and that he would begin with Johnson, who was "making [him] the most nervous." (*Id.* at 20:05:07–26).

Sergeant Faust approached the vehicle a second time, and testified that he detected a "new odor" of "cologne or some type of deodorizer" coming from the vehicle. (Tr. at 18). In Sergeant Faust's experience, people often use cologne or a deodorizer as a masking agent to hide the smell of illegal narcotics. (*Id.* at 18–19). Sergeant Faust told Johnson that it smelled like

---

[3]     "Shake" refers to the "flakes or particles of marijuana" that may be left behind after someone rolls a marijuana cigarette or otherwise handles marijuana. *See* (Tr. at 19).

someone had been "spraying some cologne or something." (Gov't's Ex. 1 at 20:05:53–57). Sergeant Faust removed Johnson from the vehicle and walked Johnson to the front of his squad car. (*Id.* at 20:05:46–20:06:17). Sergeant Faust conducted a pat-down search of Johnson and the video shows him pointing out to Johnson the marijuana shake he had observed earlier on Johnson's shirt. (*Id.* at 20:06:18–20:07:06). Sergeant Faust did not collect the marijuana shake from Johnson's clothing for evidentiary purposes. (Tr. at  28–29, 33–34).

Sergeant Faust put Johnson in the back of his squad car. (Gov't's Ex. 1 at 20:07:22–23). For a third time, he approached the vehicle. (Tr. at 20). He removed the passenger from the vehicle, and conducted a pat-down search of the passenger. (*Id.* at 20); *see* (Gov't's Ex. 1 at 20:07:37–20:08:56). Sergeant Faust explained to the passenger that Johnson had marijuana shake on his shirt and that marijuana shake was also visible on the passenger's clothing. (*Id.* at 20:08:18–32). Sergeant Faust also told the passenger that he believed "somebody had sprayed something like they were trying to cover something up." (*Id.* at 20:08:33–36). The passenger was placed in the back of Officer Xiong's squad car. (Tr. at 20). Sergeant Faust did not collect the marijuana shake from the passenger's clothing for evidentiary purposes. (*Id.* at 29).

Sergeant Faust, Officer Xiong, and a third officer that arrived on the scene then conducted a search of the vehicle. (*Id.* at 20, 35). During the search, the officers found a mason jar containing marijuana in the vehicle's center console and a handgun located behind the driver's seat. (Tr. at  21–23); *see also* (Gov't's Ex. 2); (Gov't's Ex. 3); (Gov't's Ex. 4). The officers also found an ammunition magazine in a jacket that was in the trunk of the vehicle. (Tr. at 34). In addition, a digital scale was found in the vehicle. (*Id.* at 37). Sergeant Faust indicated in his report that the scale was found in the trunk, but the scale was photographed in the back seat of the vehicle. (*Id.* at 37); (Def.'s Ex. 2). Someone must have moved the scale, according to

Sergeant Faust, who did not recall moving the scale himself. (Tr. at 38). Sergeant Faust did not believe that any other items were moved from trunk, but believed that it was good police work to move the scale before photographing it because officers would "need to remove it at some point in time." (*Id.* at 38–39). Sergeant Faust did not believe that any rolling papers were discovered in the vehicle and testified that no other tool used to smoke marijuana was found in the vehicle. (*Id.* at 31–32). Finally, Sergeant Faust testified that he could not recall whether he found a masking agent and conceded that his report did not include any reference to the fact that a masking agent was found. (*Id.* at 29–31).

## III.   DISCUSSION

### A.   Legal Standard

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "An officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop is consistent with the Fourth Amendment." *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010). An officer is "entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop," but in order to "continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Id.* (internal quotation marks omitted). That is, "[t]he principles of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), govern traffic stops." *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004). To determine "[w]hether an officer has reasonable suspicion to expand the scope of a traffic stop," a

court considers "the totality of the circumstances, in light of the officer's experience." *Shafer*, 608 F.3d at 1062 (internal quotations marks omitted).

In addition, "[o]fficers conducting investigative stops 'may take steps reasonably necessary to protect their personal safety.'" *United States v. Binion*, 570 F.3d 1034, 1039 (quoting *United States v. Stachowiak*, 521 F.3d 852, 855 (8th Cir. 2008)). A pat-down search or "protective frisk" for officer safety is warranted when "specific articulable facts taken together with rational inferences support the reasonable suspicion that a party was potentially armed and dangerous." *Id.* (internal quotations marks omitted). Whether a frisk was supported by reasonable suspicion is an objective inquiry and requires the court to consider "'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* (quoting *Terry*, 392 U.S. at 27).

Further, while searches "'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions,'" one such exception is "the automobile exception." *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011) (quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)). The automobile exception "allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *Id.* (internal quotation marks omitted). Probable cause exists when "there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Whether probable cause exists "at the time of the search is a commonsense, practical question, to be judged from the totality of the circumstances." *Id.* (internal quotation marks omitted).

### B.      Analysis

Johnson primarily argues that officers searched his vehicle without probable cause. (Mem. in Supp. at 1, 2, 14, 15). Johnson also appears to argue that Sergeant Faust impermissibly expanded the scope of the traffic stop. *See* (*id.* at 7–8, 14, 15). Essentially, Johnson argues that Sergeant Faust's "account of what he observed is simply not believable" and that the Court should therefore dismiss as untruthful Sergeant Faust's testimony regarding his observations that served as the basis for the extension and expansion of the scope of the traffic stop and the search of Johnson's vehicle. *See* (*id.* at 9). In response, the Government contends that the video evidence of the stop and search of Johnson's vehicle "corroborates Sergeant Faust's testimony" and that Johnson's "attack on Sergeant Faust's credibility is without merit." (Resp. at 1–2).

In order to determine whether the stop and search were lawful, the Court will first consider Johnson's challenges to Sergeant Faust's credibility. After addressing Johnson's credibility arguments and making related factual findings, the Court will consider whether the scope of the traffic stop was impermissibly extended and expanded and whether probable cause supported the search of Johnson's vehicle.

### 1.      Sergeant Faust's Credibility

### a.      Marijuana Shake

Johnson first argues that, in light of the circumstances surrounding Sergeant Faust's observations, it is "inconceivable" that Sergeant Faust observed shake when he first approached the vehicle. (Mem. in Supp. at 9–11). Specifically, Johnson argues that Sergeant Faust's testimony that he observed shake is unbelievable because: 1) it was dark out at the time of the stop; 2) Johnson and the passenger were wearing dark clothing and Johnson was wearing a "thick necklace . . . that hung low"; 3) Sergeant Faust did not "duck his head inside" the vehicle

to observe the shake; 4) Johnson and the passenger made denials regarding the presence of shake or marijuana; and 5) Sergeant Faust testified that the shake would not have weighed anything. (*Id.* at 9–10).

Johnson's argument ignores the fact that Sergeant Faust utilized a flashlight when he first approached the vehicle, permitting him to see Johnson, the passenger, and the interior of the vehicle. *See* (Gov't's Ex. 1 at 19:59:37–40). It also ignores the reality that the headlights from Sergeant Faust's squad car provided some additional illumination. *See* (*id.*). In addition, Johnson's argument that Sergeant Faust could not have seen the shake because he testified that it would not have weighed anything is unpersuasive. Sergeant Faust testified that the shake "would have not weighed anything **that [his] scales could have detected**." (Tr. at 41) (emphasis added). That the shake would not add up to a detectable weight on a scale does not mean that the shake would not be visible to a trained officer. *See United States v. Ayon*, No. CR99-4073-DEO, 2000 WL 34032985, at *8 (N.D. Iowa Mar. 3, 2000) (stating that a "large plastic bag of marijuana" had a net weight of only "26.0 grams"). Moreover, while Johnson and the passenger may have made denials regarding the presence of shake or the use of marijuana at certain points during the stop, Sergeant Faust's testimony that he observed shake is consistent with his report to Officer Xiong, that during his initial approach of the vehicle he had observed "green stuff" on Johnson's shirt that "look[ed] like weed" and is also consistent with his later statements to Johnson and the passenger that he observed shake on their clothing. (Gov't's Ex. 1 at 20:05:05–09, 20:06:20–20:07:15, 20:08:18–32).[4]

---

[4]      The Court understands Sergeant Faust's testimony that he saw "fresh marijuana particles inside the vehicle" to refer to the fact that he observed marijuana on Johnson, who was inside the vehicle when Sergeant Faust initially approached the vehicle. *See* (Tr. at 21). Therefore, to the extent Johnson challenges Sergeant Faust's testimony that he observed marijuana shake "inside

**b.**     **Odor of Marijuana**

Second, Johnson argues that Sergeant Faust's testimony that he detected the smell of fresh marijuana coming from the vehicle was not credible because Sergeant Faust asked Johnson and the passenger if they had been smoking marijuana or if anyone had been smoking marijuana in the vehicle. (Mem. in Supp. at 11); *see also* (Gov't's Ex. 1 at 20:01:12–22). Johnson asserts that Sergeant Faust's testimony is impeached on the ground that Sergeant Faust testified that he "knew the difference" between the "odor of fresh and smoked marijuana." (Mem. in Supp. at 11); *see also* (Tr. at 25). The Court notes that in his statement of his observations made to Officer Xiong, Sergeant Faust did not inform Officer Xiong that he had detected the odor of marijuana upon his initial approach to the vehicle and that, contrary to Sergeant Faust's testimony, he did not later tell Johnson or the passenger that he was removing them from the vehicle because he had smelled fresh marijuana. (Gov't's Ex. 1 at 20:04:51–20:05:26); *compare* (Tr. at 19–20) *with* (Gov't's Ex. 1 at 20:05:47–20:09:25). Nonetheless, the Court does not find Sergeant Faust's testimony that he detected the smell of fresh marijuana coming from Johnson's vehicle implausible or unbelievable on these grounds.

First, although Sergeant Faust asked whether Johnson and the passenger had been smoking marijuana and whether anyone had been smoking marijuana in the vehicle, he told Johnson and the passenger that he detected a "slight odor of marijuana in the vehicle," without specifying whether he had detected the odor of burnt or fresh marijuana. (Gov't's Ex. 1 at 20:01:12–22). This aspect of Sergeant Faust's statement to Johnson and the passenger was therefore not inconsistent with his testimony that he detected the odor of fresh marijuana. In

---

the vehicle" separate from the shake on Johnson's clothing, the Court does not separately evaluate Johnson's argument.

addition, having detected the odor of fresh marijuana, Sergeant Faust may have asked Johnson and the passenger questions about smoking marijuana to determine whether Johnson or the passenger were, at the time of the stop, under the influence of marijuana and to further engage Johnson and the passenger on the topic of marijuana use. Indeed, such questioning seems particularly logical given Sergeant Faust's observation of marijuana shake. Finally, Sergeant Faust testified consistently that he detected the odor of fresh marijuana when he initially approached the vehicle and this testimony is bolstered by his credible testimony that he observed marijuana shake on Johnson's shirt at this same point in time. (Tr. at 14, 16); *see also* (*id.* at 15).

Johnson further contends that Sergeant Faust's testimony regarding the odor of fresh marijuana coming from the vehicle is undermined by the fact that the only marijuana collected from vehicle was contained in a "tightly shut" mason jar that was stored in the center console. (Mem. in Supp. at 12). This argument similarly fails to undermine the credibility of Sergeant Faust's testimony that he smelled the odor of fresh marijuana. As noted by the Government, the fact that the mason jar was closed and in the center console at the time officers found it in Johnson's vehicle does not rule out the fact that the jar could have been open in the vehicle at some point prior to Sergeant Faust's stop of vehicle and/or prior to Sergeant Faust's approach to the vehicle. *See* (Resp. at 9). In addition, the marijuana shake on Johnson and the passenger may have contributed to the odor of marijuana detected by Sergeant Faust.

Johnson also argues that Sergeant Faust's testimony regarding the smell of marijuana is not credible because "no joints, rolling papers[,] or other paraphernalia used to smoke marijuana" were found in the vehicle. (Mem. in Supp. at 11). Again, the Court does not find that these circumstances undermine Sergeant Faust's credibility. The absence of paraphernalia used to smoke marijuana does not raise doubts about Sergeant Faust's testimony that he observed the

smell of fresh marijuana coming from the vehicle, particularly in light of his consistent statements, both at the time of the stop and in his testimony at the motions hearing, that he smelled marijuana and observed marijuana shake. *See* (Gov't's Ex. 1 at 20:01:12–20:01:22, 20:05:05–09, 20:06:18–20:07:06); (Tr. at 14–15, 21).

### c.      Odor of Masking Agent

Johnson argues that the Court should discredit Sergeant Faust's testimony that he detected the smell of a masking agent because there is "no evidence [of the] cologne or any masking agent" that Sergeant Faust indicated he smelled upon approaching the vehicle a second time. (Mem. in Supp. at 11–12.) With regard to the masking agent, Sergeant Faust testified that he could not recall whether he found a masking agent and conceded that his report did not include any reference to the fact that a masking agent was found. (Tr. at 29–31). Nonetheless, the video of the stop corroborates Sergeant Faust's testimony that he detected a new odor of cologne or other masking agent upon approaching the vehicle for a second time. *See* (Gov't's Ex. 1 at 20:05:53–57). That Sergeant Faust could not recall whether a masking agent was ultimately recovered and failed to mention the discovery of a masking agent in his report does not demonstrate that Sergeant Faust was lying both at the time of traffic stop and during his testimony. Even if there was no masking agent ultimately recovered from Johnson's vehicle, it does not follow that Sergeant Faust fabricated his statements to Johnson and the passenger that he detected the odor of a masking agent and perpetuated that lie in his testimony.

### d.      Position of Driver's Seat

Johnson also challenges Sergeant Faust's testimony that Johnson's seat was reclined unusually far backwards. (Mem. in Supp. at 13). Johnson argues that Defendant's Exhibit 1, the video taken from Officer Xiong's squad car, shows that the driver's seat was not moved during

the course of the search of the vehicle and that Defendant's Exhibit 2 shows that the driver's seat was not reclined very far and was reclined to the same degree as the passenger seat. (*Id.*). The Court has reviewed Defendant's Exhibit 1 and finds no support for Johnson's contention that the video shows that the seat was not moved during the course of the search. Rather, the driver's seat and the officers' efforts to search this area of the car are obscured from view and not ascertainable from a viewing of the video.[5] Likewise, Defendant's Exhibit 2 provides no support for Johnson's argument. First, Defendant's Exhibit 2 is a photograph taken from a different vantage point than that of Sergeant Faust when he stood outside of Johnson's vehicle at the front driver's-side door. *See* (Def.'s Ex. 2). More importantly, as the Government points out, there was no testimony at the hearing that Defendant's Exhibit 2 shows "the position of the driver's seat at the time Sergeant Faust had his initial encounter" with Johnson. (Resp. at 7); *see also* (Tr. at 36–40).[6]

---

[5]     The Court has also reviewed Government's Exhibit 1, Sergeant Faust's squad car video, and it also does not show the position of the driver's seat or any actions taken by officers in searching this area of the car.

[6]     Johnson also attempts to impugn Sergeant Faust's credibility based on Sergeant Faust's testimony that he turned off his microphone during the search of Johnson's vehicle to protect police tactics that may be discussed during a search. (Mem. in Supp. at 15); (Tr. at 23–24). Johnson argues that this testimony raises doubts about Sergeant Faust's credibility because both Johnson and the passenger were detained at the time of the search. (Mem. in Supp. at 15). This argument ignores the details of Sergeant Faust's explanation for turning off his microphone, which were that in order to "protect [police] tactics" it is "common practice" for officers to turn off their microphone "when officers are talking amongst each other about the tactics and things like that [they're] using" so that such tactics are **not recorded**. (Tr. at 23–24) (emphasis added). Johnson further attempts to undermine Sergeant Faust's credibility based on his testimony that after his initial approach to the vehicle he moved his squad car, in part, so that he could see the driver's door of the vehicle. (Mem. in Supp. at 3–4, 15); *see also* (Tr. at 16–17). Johnson argues that Government's Exhibit 1 shows that Sergeant Faust could not see the driver's door even after moving his squad car. (Mem. in Supp. at 3–4, 15). The Court has reviewed Government's Exhibit 1 and finds that, consistent with Sergeant Faust's testimony, his movement of the squad car provided him with an improved, even if not perfect, view of the driver's side of the vehicle. *See* (Gov't's Ex. 1 at 20:01:58–20:02:16).

### e.        Poor Police Work

Finally, Johnson suggests that the Court should find that Sergeant Faust was not credible because Sergeant Faust did not conduct sound police work. *See* (Mem. in Supp. at 15). Some aspects of Sergeant Faust's testimony trouble the Court; particularly Sergeant Faust's concession that he failed to collect the marijuana shake from Johnson and the passenger and his statement that it was permissible for some of the evidence to be moved around within the vehicle prior to the evidence being photographed or collected for evidentiary purposes. *See* (Tr. at 34, 37–40, 41). This is poor police work and, had Sergeant Faust or his fellow officers simply collected the marijuana shake, it would have avoided at least some of Johnson's challenges to Sergeant Faust's credibility. Nevertheless, the Court finds Johnson's credibility challenges unpersuasive and declines to infer from isolated instances of poor police work that Sergeant Faust lied about his observations during the stop. Indeed, given the video evidence before the Court, under Johnson's theory, the Court would have to conclude that Sergeant Faust not only lied in his testimony at the motions hearing, but that he articulated false observations at the time of stop, including when he recounted many of those observations to his fellow officer, Officer Xiong. In light of the evidence in the record and after having the opportunity to observe Sergeant Faust's demeanor on the witness stand, the Court finds it implausible that Sergeant Faust created and perpetuated a false version events in such a calculated manner.

### f.        Findings of Fact Regarding Sergeant Faust's Observations

Based on the above credibility determinations, the Court finds that Sergeant Faust smelled the odor of fresh marijuana, observed shake on Johnson's shirt, and observed Johnson acting in a very nervous manner during his initial approach to Johnson's vehicle. The Court further finds that during his first approach to the vehicle Sergeant Faust observed the driver's

14

seat, in which Johnson was sitting, and that the seat was reclined unusually far backwards. In addition, the Court finds that upon approaching Johnson's vehicle for a second time, Sergeant Faust detected the smell of cologne or other masking agent. Finally, the Court finds that Sergeant Faust observed shake on both Johnson and the passenger during the course of their respective pat-down searches.

### 2.    Lawfulness of Searches

Having made the above findings of fact, the Court now considers whether, in light of those facts, there was reasonable suspicion to expand or extend the scope of the traffic stop and whether there was probable cause to search Johnson's vehicle.

### a.    Reasonable Suspicion to Expand or Extend Traffic Stop

Johnson concedes that the traffic stop was lawful at its inception, in that it was based on probable cause that a traffic violation had occurred. (Mem. in Supp. at 7). Johnson appears to argue, however, that Sergeant Faust impermissibly expanded or extended the scope of the traffic stop. (*Id.* at 8–9, 14, 15). Johnson does not clearly identify any particular point at which the traffic stop should have ceased or what actions taken by Sergeant Faust constituted an unlawful expansion of the traffic stop. It is clear, however, that Johnson's detention beyond that which was required for the initial traffic stop was supported by reasonable suspicion and therefore did not result in a Fourth Amendment violation.

An officer may extend or expand the scope of a traffic stop if "the officer [is] aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Shafer*, 608 F.3d at 1062 (internal quotation marks omitted). In the course of his initial approach to the vehicle—that is, early in the course of the traffic stop—Sergeant Faust: 1) smelled the odor of fresh marijuana

coming from the vehicle; 2) observed marijuana shake on Johnson's shirt; 3) observed Johnson acting nervously; and 4) observed Johnson reclining "unusually far backwards" in his seat, which, based on his experience as a law enforcement officer, was something people do when they are trying to hide something or "trying to conceal the back portion of the vehicle." (Tr. at 14–16); (Gov't Ex. 1 at 20:01:12–20:01:22, 20:04:51–20:05:26). At this point in time, considering the totality of these circumstances in light of Sergeant Faust's training and experience, Sergeant Faust had at least a reasonable suspicion that criminal activity was afoot, warranting an extension and expansion of the stop beyond the scope of the initial traffic stop.[7] *See Binion*, 570 F.3d at 1039 (concluding that experienced officer had reasonable suspicion of criminal activity to expand scope of traffic stop "because of the strong odor of marijuana emanating from the car and [the defendant], as well as his lethargy, nervousness, and shakiness"); *cf. United States v. Peltier*, 217 F.3d 608, 610 (stating that "the smell of marijuana gave the deputy probable cause to search" the defendant's vehicle). *See also United States v. Bost*, No. 3:11-Cr-139, 2012 WL 2865895, at *12 (E.D. Tenn. May 3, 2012) (stating that "[r]egardless of the point at which the scope of the initial traffic stop was exceeded" there were "intervening facts" that "provided reasonable suspicion to extend the traffic stop beyond the duration and scope permissible based upon the initial purpose of the stop").

Johnson argues that, to the extent his seat was reclined, it should not have aroused suspicion. *See* (Mem. in Supp. at 13). Rather, Johnson contends that "[i]t would make sense" for

---

[7]    Sergeant Faust testified to the following training and experience: Sergeant Faust has worked as a patrolman with the BPPD for approximately five years and was previously employed as a deputy sheriff for two years. (Tr. at 5–6). Sergeant Faust also served as a patrolman when employed as a deputy sheriff. (*Id.* at 6). As a patrolman, Sergeant Faust "respond[s] to 911 calls," "investigate[s] crimes," and is "responsible for traffic enforcement." (*Id.* at 6). Sergeant Faust has training and experience in narcotics. (*Id.* at 25).

him to recline his seat rather than push it back because he "is a bigger guy with a larger belly." (*Id.*). Similarly, Johnson argues that the fact that he appeared nervous to Sergeant Faust does not provide grounds for a search, because "[a]nyone in [his] position would have felt nervous." (*Id.* at 14). The Court must determine, however, "whether the facts **collectively** provide a basis for reasonable suspicion, rather than determine whether each fact separately establishes such a basis." *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) (internal quotation marks omitted). In addition, the possibility that one might "conceive of innocent explanations for [a] suspicious circumstance" does not warrant the conclusion that such circumstances cannot contribute to an officer's reasonable suspicion formed in light of the officer's training and experience. *Id.* at 459. Johnson's unusually reclined seat and nervous behavior, when considered in "the totality of the circumstances [and] in light of the officer's experience," support the conclusion that reasonable suspicion permitted an expansion and extension of the stop. *See Shafer*, 608 F.3d at 1062.

In addition, after making the above observations that amounted to reasonable suspicion, Sergeant Faust worked "diligently" to "confirm or dispel [his] suspicions." *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999). Sergeant Faust returned to his squad car, ran the driver's license information of Johnson and the passenger, ran their information through computer databases to determine their criminal history, and promptly requested back up to assist him in "further conduct[ing] a narcotics investigation."[8] (Tr. at 15–16). Sergeant Faust and his fellow officers quickly proceeded with their investigation, and the entire stop and investigation concluded within approximately 26 minutes. *See* (Gov't Ex. 1 at 19:59:28–20:25:17); *Binion*,

---

[8]     When an officer conducts a "routine traffic stop" he may "detain a motorist while [he] completes certain routine tasks," including the completion of "computerized checks of a driver's license . . . and criminal history." *Fuse*, 391 F.3d at 927.

570 F.3d at 1040 ("[I]t appears that the troopers acted diligently because only a half hour elapsed between the traffic stop and when [the defendant] was taken into custody.").

Finally, to the extent Johnson argues that Sergeant Faust unlawfully expanded the scope of the traffic stop by conducting a pat-down search of his person, his contention is without merit. *See* (Mem. in Supp. at 9, 15). When Sergeant Faust conducted the pat-down search, he had observed Johnson acting nervously, reclining strangely in his seat as if he was hiding something, and had both smelled and observed marijuana. (Tr. at 14–16); (Gov't's Ex. 1 at 20:01:12–20:01:22, 20:04:51–20:05:26). In addition, Sergeant Faust learned that Johnson was on federal probation and smelled cologne or some other masking agent. (Tr. at 18); (Gov't's Ex. 1 at 20:05:00–05, 20:05:53–57). From these facts and the rational inferences based thereon, Sergeant Faust could have reasonably suspected that Johnson may have been armed and dangerous. *See Binion*, 570 F.3d at 1037, 1039–40 (concluding that officer had reasonable suspicion to conduct a protective frisk of defendant when officer "reasonably . . . suspected that drugs were being transported in the car," another person in the vehicle "had been apparently trying to hide something under the front seat," had been speeding at a late hour and had "an outstanding warrant for his arrest," and when the defendant reached for his back pocket after being handcuffed and was uncooperative by refusing to extinguish his cigarette until ordered to do so several times); *Stewart*, 631 F.3d at 459 (reasoning that physical movements indicating that an individual was hiding or retrieving something and nervous behavior are facts that contribute to the reasonableness of officer's suspicion that a person is armed and dangerous); *Fuse*, 391 F.3d

at 929–30 (reasoning that defendant's criminal history contributed to trooper's reasonable suspicion).[9]

### b. Probable Cause to Search Vehicle

Johnson also argues that there was no probable cause to search his vehicle. (Mem. in Supp. at 2, 7, 14–15). Before officers searched Johnson's vehicle, Sergeant Faust had: 1) detected the odor of fresh marijuana coming from the vehicle; 2) observed marijuana shake on Johnson and the passenger; 3) observed Johnson's "super nervous" behavior; 4) viewed Johnson reclining unusually far backwards in his seat as if he was attempting to hide something; 5) learned that Johnson and the passenger were on federal probation; and 6) detected the odor of cologne or another masking agent coming from the vehicle. (Tr. at 14–16, 18); (Gov't's Ex. 1 at 20:01:12–20:01:22, 20:04:51–20:05:57, 20:08:18–39). Under the totality of the circumstances, there was ample probable cause to search Johnson's vehicle. *See United States v. Beard*, 708 F.3d 1062, 1066 (8th Cir. 2013) (concluding that vehicle search was "lawful under the automobile exception" when trooper "smelled raw marijuana immediately after Beard rolled down his car window"); *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006) (concluding that troopers had probable cause to search defendant's vehicle without a warrant when they observed cellophane packages they recognized as probable contraband and when

---

[9]     *Cf. United States v. Brown*, 913 F.2d 570, 572 (8th Cir. 1990) (concluding that, when officers had reasonable suspicion that vehicle occupants were "dealing drugs," protective *Terry* search was supported by reasonable suspicion that occupants were armed and dangerous because "weapons and violence are frequently associated with drug transactions"); *Bost*, 2012 WL 2865895, at *14 (noting that although officer did not have reasonable suspicion that defendant was involved in criminal drug activity, evidence that was "reasonably perceived . . . as an indicator of possible involvement in drug trafficking contributed to [the officer's] reasonable belief that the [d]efendant may have been armed and dangerous").

troopers detected odor of a masking agent). As a result, the Court recommends that, to the extent Johnson's Motion to Suppress seeks the suppression of evidence seized during the search of the vehicle, the Motion to Suppress be denied.

### c.      Cell Phone

At certain points in his memorandum in support of his motion, Johnson asks the Court to suppress a cell phone that was collected from him during a search of his person and that was later searched. *See* (Mem. in Supp. at 2, 9, 15). For the reasons discussed below, the Court recommends that, to the extent Johnson seeks suppression of a cell phone on grounds not already addressed in this Report and Recommendation, Johnson's Motion to Suppress be denied without prejudice.      The primary thrust of Johnson's briefing is that Sergeant Faust lacks credibility and that, if one discredits Sergeant Faust's version of events, there was no probable cause to search the vehicle. *See* (*id.* at 1, 2, 15).[10] As a result, Johnson has focused his briefing on whether evidence found in the vehicle should be suppressed. (*Id.* at 1) (stating that Johnson's memorandum is submitted "in support of his pretrial motion to suppress the evidence found inside a rental vehicle he was driving"). However, because Johnson cites to authority regarding when an officer may expand or extend the scope of a traffic stop, the Court has separately addressed Johnson's general contentions regarding extension and expansion of the traffic stop. *See* (*id.* at 8–9, 14, 15).

---

[10]      Indeed, at the hearing on Johnson's Motion to Suppress, the Government stated that it had discussed with Johnson's attorney the specifics of Johnson's grounds for suppression, as the Motion to Suppress was "fairly vague." (Tr. at 4). Based on the discussions of counsel, the Government stated that the suppression issues were "one, whether the stop of the defendant's car was with probable cause," and two, "whether there was probable cause for the search of the car." (*Id.*) As noted above, Johnson now concedes that there was probable cause for the stop of the vehicle. (Mem. in Supp. at 7).

Beyond the above theories, it is unclear on what basis Johnson seeks suppression of the cell phone. First, to the extent that the search of Johnson's person in question is the pat-down search discussed above, the record before the Court provides only minimal information regarding a cell phone related to this search and provides no information regarding the circumstances of the subsequent search of any cell phone. At the hearing on Johnson's Motion to Suppress, the only testimony regarding a cell phone was Sergeant Faust's testimony that he collected two cell phones and that one of the cell phones "came from Mr. Johnson." (Tr. at 27). And upon review of Government's Exhibit 1, it appears that Johnson was conversing on a cell phone when Sergeant Faust instructed him to step out of the vehicle, that Sergeant Faust instructed Johnson to put the cell phone down on the driver's seat, and that Johnson placed the cell phone on the roof of the vehicle. *See* (Gov't's Ex. 1 at 20:05:49–20:06:10). The Court cannot discern from the video what further actions were taken with regard to this cell phone, and Johnson does not argue that it was unreasonable for Sergeant Faust to instruct him to put his cell phone down on the seat before Sergeant Faust conducted a pat-down search. In fact, Johnson does not discuss these events in any manner in his memorandum, and Johnson articulates no legal theory pursuant to which the Court should suppress the cell phone or any information obtained through a subsequent search of the cell phone, other than his general contention that the scope of the traffic stop was unlawfully expanded, his apparent contention that the pat-down search of his person was not based on reasonable suspicion, and his contention that his vehicle was searched without probable cause.

In addition, Johnson's briefing regarding a search of his person that led to the cell phone further complicates this issue. Johnson provides no citation to the record identifying when the challenged search of Johnson's person occurred and at various points in his brief, Johnson

21

appears to place the search of his person as occurring after the vehicle search began. *See* (Mem. in Supp. at 5) (describing the search of Johnson's vehicle and then stating, "Further, Faust collected a cell phone from Mr. Johnson."); *see also* (*id.* at 2). Thus, it is unclear whether Johnson challenges, as the fruit of the allegedly unlawful vehicle search, a cell phone that was seized during a search of his person that occurred after the search of the vehicle and which may be a different cell phone than the one visible in Government's Exhibit 1. Given the very limited facts in the record regarding the cell phone, the absence of a legal argument by Johnson, other than those already addressed herein, and the critical import of suppression issues in a criminal proceeding, the Court declines to speculate regarding suppression of the cell phone. Therefore, to the extent Johnson seeks suppression of a cell phone on grounds not already addressed by the Court, the Court recommends that Johnson's Motion to Suppress be denied without prejudice.

## IV.  RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Johnson's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 15] be **DENIED** to the extent the Motion seeks suppression of evidence seized during the search of the vehicle and **DENIED WITHOUT PREJUDICE** to the extent the Motion seeks suppression of a cell phone on grounds not addressed herein.


Dated: September 11, 2014

*s/Steven E. Rau*
Steven E. Rau
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **September 18, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.